**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-2331**

DEBORAH T. RUFF,

                              Plaintiff - Appellant,

        versus

TARGET STORES, Incorporated,

                              Defendant - Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte.  Robert J. Conrad, Jr.,
District Judge.  (CA-04-54-3)

Argued:  January 30, 2007          Decided:  March 14, 2007

Before WIDENER, WILLIAMS, and SHEDD, Circuit Judges.

Affirmed by unpublished opinion. Judge Williams wrote the opinion,
in which Judge Widener concurred. Judge Shedd wrote a separate
concurring opinion.

**ARGUED:** Jenny Lu Sharpe, Charlotte, North Carolina, for Appellant.
Raymond Charles Baldwin, SEYFARTH & SHAW, L.L.P., Washington, D.C.,
for Appellee.  **ON BRIEF:** Jessica R. Hughes, SEYFARTH & SHAW,
L.L.P., Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WILLIAMS, Circuit Judge:

Deborah Ruff appeals the district court's grant of summary judgment to Target Stores, Inc. ("Target") on Ruff's claims of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-634 (West 1999 & Supp. 2006), and the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2 (2005). Ruff argues that the district court erred in finding that she could not show that she was meeting Target's legitimate expectations or that Target's justification for terminating her was pretextual and in concluding that she could not proceed under the "mixed-motive" framework established by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), because she lacked direct evidence of age discrimination. Because Ruff has not provided evidence that would allow a reasonable jury to determine that Target discriminated against her on the basis of age, we affirm.

I.

Because this is an appeal from the district court's grant of summary judgment to Target, we review the facts in the light most favorable to Ruff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

In 1990, Ruff was hired as an area manager at a Target store in Gastonia, North Carolina. Her job required her to manage a particular area of the store, called "hardlines," which included merchandise such as electronics, books and sporting goods. Target referred to this position as Executive Team Leader or "ETL" hardlines.[1] As part of her job, Ruff managed the entire store on a rotating basis with other area managers. On these days she was the "Leader on Duty" or "LOD." Ruff's immediate supervisor at the Gastonia Target was the Store Team Leader, Mark Burud.

Toward the end of the 1990s, Target stores in the Charlotte district, of which Gastonia formed a part, were underperforming. In an effort to boost their profitability, Target hired J.J. Erlbacher as the District Team Leader for the Charlotte district in 2000. At some point after Erlbacher accepted the position, Marvin Glenn Kiser, the Gastonia Target's Assets Protection Team Leader, heard Erlbacher make a statement to the effect that "he wanted to replace team leaders with younger college graduates, because they were 'the way of the future for Target.'" (J.A. at 632.)[2] Kiser could not remember if Erlbacher made the statement before or after Ruff was terminated. Ruff remembers a lunchtime conversation at

---

[1]Target stores generally have ETLs for the following departments: hardlines, softlines, guest services, logistics, and team relations, although the total number of ETLs in a given store may vary by the size and sales volume of the store.

[2]Citations to the "J.A." refer to the joint appendix filed with this appeal.

3

Target in which another ETL, Bill Plafcan, mentioned that everyone Erlbacher hired seemed to be young and straight out of college. Ruff responded that she had been told that "that was the direction of the company, that . . . you could not be an executive anymore unless you were a college graduate." (J.A. at 347.) Ruff did not have a college degree, but at the time she was hired, Target required "either a college degree or . . . years of experience in retail management," which she did have. (J.A. at 347-48.) She asked Plafcan, who did not have a college degree, "weren't you hired by [Erlbacher]," and he responded that he "slipped in under the fence before [Erlbacher] got here." (J.A. at 348.)

Ruff was 47 years old in 2000, when Erlbacher became the Charlotte DTL. After 2000, the scores that she received on her job evaluations began to decline. Ruff's 2000 job evaluation was an 83.2 out of 100, which Target considered "excellent," although the evaluation identified a number of areas in which Ruff's performance was weak, such as "effective use of time," "manag[ing] performance and development plans," and "establish[ing] clear directions." (J.A. at 61-73.) Ruff received a score of 75.4 on her 2001 job evaluation, which Target considered "satisfactory plus." The 2001 evaluation again identified "effective use of time," "manag[ing] performance and development plans," and "establish[ing] clear directions" as areas in which Ruff needed to improve. (J.A. at 83, 219-231.)

4

In January 2002, Brian Fiala, the Senior Vice President of the North/East Region of Target, conducted a visit to the Gastonia store. Ruff was the LOD on the day of his visit, which meant that she was responsible for the condition of the store. Fiala was very displeased with what he saw and complained to Erlbacher. Fiala expressed concern that product in the back was not being put out on display and also criticized the general condition of the store and the leadership in the building. He was particularly upset that Ruff seemed "nonchalant" about the problems. Erlbacher remembers Fiala remarking that Ruff had "kind of laughed" and made a comment about getting to it later, which Fiala perceived as evidencing a lack of accountability and desire to excel at Target. (J.A. at 132.) According to Erlbacher, Fiala would have preferred that Ruff "be up front with [him]" and let him know that she had a "plan of action" to address the problems. (J.A. at 133.)

In July 2002, Burud told Ruff that Erlbacher wanted her resignation, which Ruff declined to give. Burud explained that a store visit that Erlbacher had conducted had not gone well. Ruff responded that this was because another ETL, Ames Livingston, had left the store in disarray, and merchandise was stacked in the aisles when she arrived at the store on the date of the inspection. She asked if Livingston would also be asked to resign. Burud replied that Livingston would "get a message," but it "[would not] be the same message [as Ruff received] because . . . he [was]

5

working on his master's and [Erlbacher could] see him as a future store manager and [Erlbacher did not] see [Ruff] as ever running a Target store." (J.A. at 382.) Ruff responded that she had never claimed that she wanted to become a store team leader and that Erlbacher's predecessor had been aware of and comfortable with her desire to remain an area manager throughout her career at Target.

Ruff's 2002 mid-year job evaluation covered her performance from January to July of that year. Target had changed the format for its evaluations in 2002 and was no longer using a numerical score. Instead, Target had adopted "The E's of Excellence." The E's refer to Energy, Enthusiasm, Execution, and Excellence, and Target has a pamphlet that explains how to excel in each of the E's. Ruff was rated medium low in all E's except enthusiasm, in which she was medium. The evaluation included comments explaining the rating under each E. The comments indicated that she needed to "hold her team accountable," "manage performance consistently," "manage execution consistent everyday," and that "consistent brand management must be achieved each day." (J.A. at 87.) The new format also rated the employee's performance as either "meeting expectations" or "not meeting expectations." Ruff's evaluation indicated that she was not meeting expectations. Ruff questioned the validity of criticism contained in the 2002 mid-year evaluation, because much of it related to incidents that occurred early in the year and had never been previously discussed with her;

6

these incidents included poor inspections in January, February, March, and April. There was no independent documentation supporting the criticism.

Over the next two months, Burud documented several instances in which Ruff's performance was lacking. Burud's notes indicated that the problems included failing to have a "total store focus," not meeting deadlines, failing to follow up on the days she was in charge of the store, spending too much time talking, gossiping, and loafing, failing to give staff an action plan over a long weekend, and disrespecting staff. Burud also noted instances in which Ruff did not return to work after an appointment and did not call to explain her continued absence, as well as one occasion on which Livingston found himself obligated to "pull together a lot of things . . . in [Ruff's] area" before a visit from Erlbacher. (J.A. at 1230.)

In August 2002, Burud issued Ruff a Written Counseling, the first disciplinary step in Target's discipline program, identifying the problems with her performance over the course of 2002. Ruff's work did not improve, and in September 2002, Burud issued her a Written Warning, the second step in Target's discipline program, identifying many of the same problems as in her Written Counseling. Ruff complained about her evaluation to Burud, who told her, "Debbie, do you know how bad this is tearing me up to do this." (J.A. at 480.) Still, Ruff's performance did not improve, and

7

Erlbacher remained both dissatisfied and unsympathetic. He conducted three or four inspections of the Gastonia store during Ruff's final months as ETL hardlines and noticed that Ruff was either not present at all during his visits or appeared briefly, only to leave the store in what he perceived as an inexplicable hurry. Erlbacher attributed Ruff's absence to "a major problem with conflict avoidance" and was unaware of any legitimate reasons that Ruff might have had for her absence or unavailability. (J.A. at 876-77.) In November 2002, Burud issued Ruff a Final Warning, the third and final step in Target's discipline program, identifying the same problems as the earlier warnings. Ruff asked Burud what she could do to improve her performance and stop receiving negative feedback. He replied "well, Debbie, I know you are working very hard, and I know there are some days that you are making the time lines down there, but . . . there is not going to be any change in your performance unless upper management changes." (J.A. at 502-03.) Ruff responded, "I guess I will be terminated because J.J. Erlbacher is not going away." (J.A. at 503.)[3]

Ruff believed that at that point Erlbacher had already made up his mind about her and had decided to force her to resign. Previously, Kiser had told Ruff that Erlbacher and Burud had stated

---

[3]Only Burud, Erlbacher, and another supervisor, Landis, would have had input into the decision to issue counseling or warnings to Ruff. Both Burud and Erlbacher had input into the decision to terminate Ruff.

8

in his presence that, "When a person is perceived . . . as a poor performer, one of the best ways to deal with getting rid of that person is to shut them out as a team; in other words, don't give them any help and don't include them."  (J.A. at 1291.)  Also, Burud had told Ruff to give another former ETL at the Gastonia Target, Pam Rea, this treatment, instructing her not to help Rea and to "[l]et her hang herself."  (J.A. at 366.)  Burud explained that he had spoken to Erlbacher and that if Rea's coworkers shut her off from the team and declined to support her, she would "go away."  (J.A. at 367.)  Rea did leave the Gastonia store.  She resigned in the beginning of 2002 at age 50 and was replaced by Seth Finkey, age 23.

Burud told Ruff that Erlbacher disliked Rea immediately, explaining that, "He didn't like how she toured.  He didn't like how she giggled.  He did not like her personality."  (J.A. at 368.)  Ruff believed that Rea had been "doing adequate," but noted that Rea seemed to irritate some of the executives because she was "a perfectionist" and "very by the book."  (J.A. at 368.)  Ruff did not opine as to whether Burud or Erlbacher shared her belief that Rea's performance was adequate and did not specify whether Erlbacher and Burud were among the executives irritated by Rea's inflexibility.

Ruff believed that Andrew Kehoe, another ETL who left the Gastonia Target in early 2002, fell victim to the same scheme.

9

According to Ruff, "He was under a lot of pressure. They were saying that he wasn't doing his job. He wasn't meeting his time lines and expectations and he gave his resignation in February and left." (J.A. at 1203.) She felt that although Kehoe might have appeared to be falling short of Target's expectations, this appearance was due to the fact that "he didn't get the payroll support and the scheduling support that he needed in the back room." (J.A. at 1203.) Kehoe was 32 at the time of his resignation and was replaced by Bill Plafcan, age 36.

Ruff perceived her treatment by supervisors to be worse than simply being isolated or denied support. She believed that Livingston and another ETL, Therese Roberts, at Erlbacher's request, purposefully sabotaged her by ensuring that she was consistently understaffed and overworked. This sabotaging made it impossible for her to meet deadlines and keep the store looking nice, and sometimes required her to have staff work overtime.

At one point, Ruff asked Erlbacher to tell her what he did not like about her and what she could do to change his opinion. Erlbacher "kind of reared back and [said] high energy, enthusiastic, do you get where I'm coming from?" (J.A. at 401.) Ruff took Erlbacher's comment to mean that she "was not young and peppy and high energy and bubbly because he had made the comment that we wanted young and bubbly people or [Burud] had told us that's what [Erlbacher] had wanted, young, bubbly people." (J.A.

10

at 401.) When asked about this exchange by Target's attorney, Ruff described it in slightly different terms. She explained that she had asked Erlbacher what exactly was wrong with her performance, and Erlbacher replied that she was "not high energy and energetic and that's what I'm looking for." (J.A. at 157.) Ruff interpreted the "high energy" comments as related to her age but never asked Erlbacher for clarification on this point.

Ruff filed a charge of discrimination with the EEOC on November 18, 2002. When asked why she filed the charge at that time, after never having mentioned that she thought the counseling and warnings were the product of discrimination when she received them, Ruff responded that, "I think that's when it . . . hit home to me that this is going to the end. You are going to be unemployed on December 1st, and it's no fault of yours. It's because one person in this company does not like you." (J.A. at 175-76.)

Ruff was terminated on December 18, 2002. She was replaced by Ames Livingston, a 24-year-old who had been the manager of another area (the "ETL softlines"). Livingston's numeric score for 2001 was 76.9, and his 2002 mid-year review indicated that he was "meeting expectations." (J.A. at 769, 774.) Livingston had received numerous counselings over performance issues at Target while he was ETL softlines. He had arrived late on a number of occasions, once because he was being bailed out of jail for an

11

alcohol-related offense.  He also had attendance issues and had come to work smelling of alcohol.  Target claimed that Livingston was not asked to resign as a result of these instances because he responded to constructive criticism and improved his performance, and because he had the motivation and the potential to advance in his career at Target.  Ruff corroborated this explanation somewhat, noting that when Burud had told her in July 2002 that he was asking for her resignation and not Livingston's, it was because Erlbacher could see Livingston, but not Ruff, as a future store team leader. In addition, Ruff asserted that Livingston was "protected" because he was a friend of Erlbacher's.  (J.A. at 337.)  Kiser also opined that Erlbacher seemed to favor Livingston over other ETLs because Erlbacher was a friend of Livingston's father.

On January 6, 2004, Ruff filed a complaint alleging age discrimination in violation of the ADEA and the North Carolina Equal Employment Practices Act, as well as other claims arising out of her dismissal,[4] in state court in Gaston County, North Carolina. Target removed the case to the United States District Court for the Western District of North Carolina.  Target moved for summary judgment, and the district court granted the motion, finding that Ruff could not establish a prima facie case of age discrimination

_____

[4]Ruff's complaint included gender discrimination claims, which she dismissed during the proceedings before the district court. Ruff also unsuccessfully pursued a retaliatory discharge claim before the district court, but chose not to appeal that issue.

12

because she could not show that she was meeting Target's legitimate expectations. Assuming arguendo that Ruff had established a prima facie case, the district found that Ruff's age discrimination claims would still fail, because she could not show that Target's asserted reason for her dismissal was pretextual. The district court assumed that Ruff could not benefit from a "mixed-motive" analysis because she lacked direct evidence of discrimination.

Ruff timely appealed. We have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006) (providing for appellate jurisdiction over "final decisions" of the district court).

## II.

We review de novo the district court's grant of summary judgment, applying the same standards that the district court was required to apply. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004) (en banc) (internal quotation marks omitted). We construe the evidence in the light most favorable to the non-moving party (Ruff) and draw all reasonable influences in her favor. Id.

13

The ADEA makes it illegal for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.A. § 623(a)(1). To succeed on an ADEA claim, the plaintiff must demonstrate, by a preponderance of the evidence, that "the plaintiff's age . . . actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000) (internal quotation marks and alteration omitted). A plaintiff can establish an ADEA claim "through two alternative methods of proof:" (1) a "pretext" framework that employs the McDonnell Douglas burden-shifting analysis used in Title VII cases, or (2) a "mixed-motive" framework. EEOC v. Warfield-Rohr Casket Co., 364 F.3d 160, 163 (4th Cir. 2004).[5] The district court applied the pretext framework to Ruff's case. Ruff argues that (1) her age discrimination claims should have survived summary judgment under the pretext framework, and (2) the district court erred in assuming that she was not entitled to proceed under the mixed-

[5]The North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2 (2005), provides, in pertinent part, that it is North Carolina's public policy to "protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgment on account of . . . age . . . by employers which regularly employ 15 or more employees." We apply the same evidentiary standards utilized in evaluating ADEA claims to state law claims under § 143-422.2. See Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995).

14

motive framework because she lacked direct evidence of age discrimination.  We address each argument in turn.

A.

Under the "pretext" framework, a plaintiff must establish a prima facie case of discrimination by showing, by a preponderance of the evidence, that (1) she is a member of a protected class[6]; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or she was replaced by a substantially younger individual.  O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310-11 (1996) (assuming that the McDonnell Douglas framework applies in the ADEA context); Hill, 354 F.3d at 285.  If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  The employer's burden is one of production, not persuasion.  Hill, at 285.  If the employer meets this burden of production "the McDonnell Douglas framework - with its presumptions and burdens - disappear[s], and the sole remaining issue [i]s discrimination vel non."  Reeves, 530 U.S. at 142-43

---

[6]For ADEA purposes, the protected class is individuals who are at least 40 years of age.  See 29 U.S.C.A. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.").

15

(internal quotation marks omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 143 (internal quotation marks and alteration omitted). "And in attempting to satisfy this burden, the plaintiff . . . must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. (internal quotation marks omitted). Thus, "the plaintiff may attempt to establish that [s]he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." Id. (internal quotation marks omitted).

The district court found that Ruff could not establish a prima facie case of age discrimination because she could not show that she was meeting Target's legitimate expectations. Ruff argues that this finding was in error because she met Target's standards from the time she was hired through 2001 -- during that period her performance evaluations never dipped below "satisfactory plus" -- and in 2002, Target's expectations were not legitimate.

To be sure, a plaintiff may establish a prima facie case by proffering evidence that demonstrates (or at least creates a question of fact) that the employer's expectations were

16

illegitimate. See Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, (4th Cir. 2006) (explaining that "[a]lthough on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all."). Even if we assume that Ruff was consistently understaffed and overworked such that she could not legitimately be expected to meet certain timelines, however, there remain numerous instances in which there was, in the words of the district court, "both a reasonable expectation of performance by the employer and a failure to live up to the standard." (J.A. at 1402.) Ruff's being denied necessary support would not excuse her failure to demonstrate initiative and accountability during the scheduled visit from regional vice-president Fiala, nor would it explain her absence during Erlbacher's visits. Similarly, Ruff's being shut out of the team would not justify her disrespecting staff, not giving staff an "action plan" before leaving for a long weekend, or failing to return to work after an appointment despite having promised to do so.

Ruff has not shown, nor even argued, that she was meeting Target's expectations to the extent that they were legitimate. Although Burud's comment that despite her hard work and periodic success at meeting her timelines, "there [was] not going to be any

17

change in [her] performance unless upper management change[d],"
(J.A. at 502-03), supports an inference that Erlbacher was
unwilling to evaluate Ruff objectively, it does not demonstrate
that the instances in which Ruff did not meet expectations (many of
which were documented by Burud) were fabricated. Ruff does not
challenge the veracity of the documented criticism. Rather, she
contends that Target failed to recognize legitimate excuses. For
example, Ruff attempts to cast doubt on the validity of Erlbacher's
complaints regarding her availability on the dates of his visits by
suggesting that she may have had legitimate motives for her
absences of which he was unaware, but does not dispute the veracity
of his statements that she was unavailable and that he considered
this unavailability a problem. Likewise, Ruff contends that she
did have a plan of action on the date of the disastrous Fiala
visit, but does not challenge Target's contention that no such plan
was communicated to Fiala. In so doing, Ruff ignores that the
relevant question is whether Target believed she was doing a good
job, not whether someone more familiar with her situation would
have thought so. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir.
2003) (holding that an employee's own testimony cannot establish a
genuine issue of material fact as to whether the employer's
legitimate expectations were met, because "[i]t is the perception
of the decision maker which is relevant" (internal quotation marks
and citation omitted)).

18

Rather than demonstrating that Target in fact considered her job performance to be adequate, Ruff attempts to show that any inadequacies were not the true motivation for her discharge. In support of this position, Ruff points primarily to Erlbacher's statement evincing a desire "to replace team leaders with younger college graduates," (J.A. at 632), and to Livingston's continued employment with Target despite his failure to meet expectations on several occasions. The district court found this evidence insufficient to show pretext, and we agree.

Ruff relies heavily on Erlbacher's comment that he "wanted to replace team leaders with younger college graduates, because they were 'the way of the future for Target.'" (J.A. at 632.) Erlbacher's statement does evidence a bias in favor of younger employees. It does not, however, indicate that the existing team leaders who would be replaced would be selected on the basis of their age. Ruff's own testimony is that the people Erlbacher went after were those who were perceived as "poor performers." Her testimony also suggested that his primary focus was on the college degree, which had become a prerequisite to obtaining an executive position at Target. Ruff noted that the one other employee over 40 who experienced treatment similar to her own was a person whom Erlbacher disliked personally. The other employee who left the Gastonia Target during the relevant time period was 32, and he was replaced by a 36-year-old. Moreover, Ruff stated that she filed a

19

discrimination charge with the EEOC upon realizing that she was about to lose her job because one person did not like her.

Erlbacher's comment, although troubling, does not constitute sufficient evidence on which a jury could conclude that Ruff was fired because of her age, particularly when viewed in light of the complete picture that Ruff painted before the district court. We have previously held that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence upon which the jury could reasonably find for the plaintiff." EEOC v. Clay Printing Co., 955 F.2d 936, 943 (4th Cir. 1992) (internal quotation marks omitted). In Clay Printing, a company brought in a consultant who suggested that "too many people have been around here too long and make too much money;" he recommended that the company seek to attract "newer, younger, people" and indicated that "if employees had been there 10 years or more, they needed to move on." Id. at 938, 942. Nevertheless, we concluded that the employees' claims could not survive summary judgment, primarily because (1) the rationale for terminating people -- that they were being overpaid -- applied equally to employees outside of the protected class, and (2) there was no statistical evidence that older workers were replaced by younger workers. Id. Thus, it was clear that employees were being discharged because they were being overpaid for the work that they were doing, not because they were old(er).

20

Of course, we noted in <u>Tuck v. Henkel Corp.</u>, 973 F.2d 371 (4th Cir. 1992), <u>overruled on other grounds by</u> <u>Hazen Paper Co. v. Biggens</u>, 507 U.S. 604 (1993), that in <u>Clay Printing</u>, "the evidence did not show that the employer's positive references to younger potential employees suggested the <u>older existing employees</u> should be fired." <u>Id.</u> at 377 n.5 (emphasis added). We stated that "[w]e do not read <u>Clay Printing</u>'s holding to prevent statements that a company wants to replace its <u>older employees</u> with younger ones from being considered evidence of age discrimination . . . ." <u>Id.</u> (emphasis added). In the case before us, however, Erlbacher's statement applies equally to all existing employees and does not specifically reference older employees. In that respect, it stands in contrast to <u>Tuck</u>, in which the employees established a prima facie case, and in which a supervisor "repeatedly stated that he wanted to get rid of the older people and replace them with 'young blood'" and had "pointedly told several older employees . . . that what Henkel needed was '<u>younger people</u>.'" <u>Id.</u> at 377. Such comments "suggest[ed] a desire to fire older employees and replace them with younger ones." <u>Id.</u>

Ruff suggests that Target's decision not to fire Livingston, who also failed to meet expectations on a number of occasions, demonstrates that Target was willing to tolerate substandard work on the part of a younger employee, and would not have fired her had she been younger. Livingston's continued employment, however, is

21

not probative of a discriminatory animus in terminating Ruff. Target claimed that any difference in the treatment of Livingston's and Ruff's shortcomings resulted from Livingston's willingness and ability to improve his job performance and advance his career at Target and Ruff's corresponding unwillingness to alter her settled ways. Ruff partially corroborated Target's portrayal of the situation; she offered deposition testimony in which she stated that when Burud asked for her resignation in July 2002, he revealed that he would not be making a similar request of Livingston because Livingston was working on his masters degree and Erlbacher could see him as an store manager some day, but could not see Ruff ever running a Target store. Moreover, Ruff offered an additional age-neutral explanation for any disparate treatment of Livingston. She asserted that she and her coworkers "all knew [Livingston] was protected because he was friends with [Erlbacher]." (J.A. at 337.) Kiser, who offered deposition testimony in support of Ruff's case, also stated that he noticed Erlbacher's relationship with Livingston "seemed to be more personable and more personal than [his relationship with] the rest of the ETLs, and [Kiser thought] that was due to some sort of relationship between [Erlbacher] and [Livingston's] father." (J.A. at 610.)

Accordingly, we conclude that the district court did not err in finding that the evidence Ruff provided did not show that she was meeting Target's legitimate expectations, nor could it support

22

a finding that Ruff's age, and not her failure to meet her job requirements, was the reason she was terminated.

B.

The district court stated that Ruff could not benefit from the "mixed-motive" framework established by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Ruff concedes that she lacks direct evidence of age discrimination, but urges us to take the opportunity to extend the Supreme Court's holding in Desert Palace, Inc. v. Costa, 539 U.S. 90, 101-02 (2003) -- that direct evidence is not required in Title VII mixed-motive cases -- to age-discrimination claims. Because we need not address the direct evidence requirement in order to resolve the case before us, we decline the invitation.

Ruff contends that the district court was correct in finding that she lacked direct evidence of age discrimination, but wrong in assuming that a plaintiff who presents only circumstantial evidence of discrimination is not entitled to proceed under a mixed-motive framework. We need not address this issue, however, because even if we were to hold that a mixed-motive framework is available to ADEA claimants who lack direct evidence of age discrimination, Ruff would not be entitled to a mixed-motive jury instruction in this instance. To pursue a mixed-motive case, a plaintiff must demonstrate that a "protected trait . . . actually played a role in

the employer's decisionmaking process and had a determinative influence on the outcome." Hill, 354 F.3d at 286 (explaining that "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination" and "[t]o demonstrate such an intent to discriminate . . . an individual . . . must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision" (internal quotation marks and alteration omitted)); Warch, 435 F.3d at 521 (holding that a plaintiff who had produced some direct and circumstantial evidence had nevertheless "failed to create a genuine dispute that he was the victim of illegal age discrimination"); Sanghvi, M.D. v. St. Catherine's Hosp., Inc., 258 F.3d 570, 574-75 (7th Cir. 2001) (holding that "[e]ven in discrimination cases where the plaintiff has direct evidence, an adverse grant of summary judgment may be proper" as "in a few select cases a review of the record as a whole may reveal that the evidence is so one-sided that [the defendant] must prevail as a matter of law" (internal quotation marks omitted) (alteration in original)).    As discussed above, Ruff cannot prove that she was the victim of intentional discrimination, because she has not

24

presented sufficient evidence for a reasonable jury to conclude that Target's decision to terminate Ruff was motivated, in whole or in part, by her age.

### III.

In sum, we conclude that the district court did not err in concluding that Ruff had not presented sufficient evidence for a reasonable jury to determine that Target discriminated against her on the basis of age. Accordingly, we affirm the judgment of the district court.

<u>AFFIRMED</u>

SHEDD, Circuit Judge, concurring:

I concur in the result reached by the majority. Based on the record presented, I believe that the district court appropriately analyzed this case under the <u>McDonnell Douglas</u> framework.[*] In doing so, the district court correctly determined that Ruff failed to establish a prima facie case because she did not show that at the time she was terminated she was performing at a level that met Target's legitimate expectations. Ruff's inability to establish a prima facie case is fatal to her claim, and it is unnecessary for us to consider the district court's alternative holding regarding the issue of pretext. Accordingly, I would affirm the summary judgment.

---

[*]I note that Ruff has conceded that she does not have direct evidence of discrimination, and I agree with the majority that the mixed-motive framework is not appropriate in this case.