**Howard B. ODOM, Plaintiff,**

v.

**INTERNATIONAL PAPER COMPANY, Defendant.**

**Civil Action No. 2:08cv480.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 31, 2009.

672

Carolyn P. Carpenter, for Plaintiff.

James N. Wilkinson, Jessica A. Neal, Lynn F. Jacob, Matthew S. Sheldon, Tiffanee W. Henderson, for Defendant.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on the motion for summary judgment filed by defendant International Paper Company ("Defendant" or "IP"). The motion has been fully briefed, and the Court having found that oral argument would not aid in the decisional process, the matter is now ripe for decision. Fed.R.Civ.P. 78, E.D. Va. Local Rule 7(J).

## I. Facts and Procedural History

### A. Odom's Job and Union Context

Plaintiff Howard B. Odom ("Plaintiff" or "Mr. Odom") began working in the Franklin, Virginia paper mill ("Paper Mill") operated by Union Camp in 1978. (Odom Tr. 13:507, 187:12–13; Odom Decl. Para. 3.) He continued to work at the Paper Mill after it was acquired by IP in 1999. (Russo Decl. Para. 2.) Mr. Odom worked in various hourly positions on the #3 Paper Machine ("Paper Machine") throughout most of his employment at the Paper Mill. (Odom Tr. 17:17–18:3; Russo Decl. Para. 4.) He was promoted several times during the course of his employment, and in 2001 he was moved up to the Backtender position on the #3 Paper Machine—a position akin to a crew leader. (Odom Tr. 20:8–10; 21:5–16; Odom Decl. Paras. 3, 4.)

By September 2007, IP employed approximately 1,238 employees in a three-shift continuous operation at the Paper Mill. (Russo Decl. Para. 2.) Some of the production and maintenance employees at IP are represented by the United Steelworkers Union AFL–CIO–CLC in conjunction with its Local 1488 ("USW"), and their terms and conditions of employment are set forth in a collective bargaining agreement ("CBA"). Mr. Odom was included in the bargaining unit represented by the USW. (Odom Tr. 17:17–18:3; Russo Decl. Para. 4.) IP and the USW are parties to the CBA, which provides a dispute resolution mechanism through which represented employees may file a grievance to challenge actions by the company that they believe are unfair or undeserved, including complaints of discrimination. The grievance procedure culminates in final and binding arbitration. (Russo. Decl. Para. 4 and Attachment 2 thereto.) IP also publishes and enforces an Equal Employment Opportunity ("EEO") policy that prohibits harassment and discrimination

based on a person's race. (Russo Decl. Para. 3 and Attachment 1 thereto; Odom Tr. 35:25–37:7.)

### B. Odom's Disciplinary Record

While Mr. Odom received satisfactory reviews during his employment at the Paper Mill, he also received documented discipline at various times. (Moses Tr. 79:15–80:19; Pl. Br. In Opp. Exhs. A1, A2, A3; Odom Decl. Para. 6, Exhs. A1–A3.) In 1997, Mr. Odom was disciplined when he left a press on while installing the first dryer section rope and the rope became tangled in the press. However, this discipline was later removed from his file upon "the Promise of [Mr. Odom] whenever faced with a non-routine job to stop, as appropriate." In signing the suspension of oral reprimand document containing that promise, Mr. Odom indicated that he would abide by the conditions of the document for the duration of his employment. (Odom Tr. 58:11–59:3, 60:24–61:2, 61:10–24, 62:8–17; Odom Depo. Exh. 9, 10.)

Another incident of discipline occurred in May 2004. This incident involved the process of "locking out" the Paper Machine so that it would be in a zero energy state (ZES) such that no moving parts could injure an employee. At the time of this incident, maintenance was being performed on a piece of equipment that was locked out by another employee.[1] After the other employee left the Paper Mill without removing his lock from the equipment, Mr. Odom was instructed to retrieve a bolt cutter. However, without approval or supervisory oversight, Mr. Odom used the bolt cutter to remove the lock, thereby committing a safety offense by violating the Paper Mill's ZES policy. (Odom Tr. 85:24–87:14; Odom Dep. Ex. 11; Odom

Decl. Para. 7.) As a result of this violation, Mr. Odom was advised that "[f]ailure to follow the procedures in the [ZES] policy will absolutely not be tolerated and will result in serious consequences." (Odom Dep. Ex. 11.) He was then issued a one-week disciplinary layoff/suspension, while also being notified that any further violations of safety policies or procedures would result in more severe disciplinary action, up to and including termination of employment. (Odom Tr. 87:9–14, 236:19–237:4.) While Mr. Odom did not sign the disciplinary form because he believed the discipline was too harsh, he did not challenge this discipline through the grievance procedure provided for in the CBA, and he did not file any charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Russo Decl. Para. 15; Odom Tr. 87:16–88:9, 89:12–22.)

### C. Conflict with Co–Worker Burt Gay

From approximately 1997 through 2007, Mr. Odom worked at various times on the same Paper Machine as hourly co-worker Burt Gay, who was "subordinate" to Mr. Odom in the chain of authority. (Odom Decl. Para. 8.) It appears that their working relationship was smooth at times, and rough at times. Mr. Odom believed that Mr. Gay failed to properly take direction from Mr. Odom (his work superior) and that Mr. Gay's conduct to Mr. Odom was harassing. (Odom Tr. 224:8–225:22, 230:13–231:15; Odom Decl. Para. 8.) Mr. Odom points to several incidents to support his assertion. For example, in 1997 Mr. Odom directed Mr. Gay to retrieve a bag of lime soda ash, and Mr. Gay responded with a visual salute, pointing to his penis. (Odom Tr. 193:1–18; Odom

---

1. As a Backtender, Mr. Odom's responsibilities included "locking out" Paper Machine equipment for maintenance. "Locking out" is a safety process utilized to ensure that machinery is in a zero energy state (ZES) during maintenance. (Russo Decl. Para. 10.) If the lock out procedure on a machine is completed properly and ZES is accomplished, then "nothing will turn to cause bodily or machine damage." (Odom Tr. 39:22–40:1.)

Decl. Para. 10.) While Mr. Odom considered this to be verbal harassment, Mr. Gay did not make any racial comments, and, with the exception of the fact that Mr. Odom is an African–American and Mr. Gay is white, Mr. Odom had no facts from which to conclude that the behavior was racially motivated. (Odom Tr. 195:5–196:17.)

Four years later, in 2001, Mr. Odom directed Mr. Gay to place a set of cores on a table, and Mr. Gay refused to do so. Mr. Odom assumed that Mr. Gay did not follow his instruction because Mr. Gay did not like taking directions from an African–American, though Mr. Odom produced no evidence to support this assumption. (Odom Tr. 205:1–206:12.) Mr. Odom admits that the only comment that Mr. Gay ever made to Mr. Odom about Mr. Odom's race was when Mr. Gay purchased a chair and picked it up from Mr. Odom's house. At that time, Mr. Gay made a statement in front of Mr. Odom that "[Mr. Odom] had a nice house for a black guy." (Odom Tr. 220:1–221:5.)

In a separate incident, in 2003, Mr. Odom asked Mr. Gay to perform a task, and Mr. Gay made a motion to Mr. Odom as if he was going to draw a knife on him. (Odom Decl. Para. 11.) Mr. Odom reported the incident to Karl Moses, an African–American supervisor, and Mr. Moses then reported the complaint to Plant Superintendent Chris Adams, who is white. Mr. Adams then interviewed Mr. Odom. According to Mr. Odom, when the interview took place he denied that Mr. Gay had drawn a knife on him because he did not want Mr. Gay to get fired. (Odom Tr. 200:9–201:1; Moses Tr. 87:9–88:22.) Mr. Odom admits that he had no reason to believe that this incident was racially motivated, other than the fact that Mr. Odom is African–American and Mr. Gay is white. (Odom Tr. 202:5–20.)

In another incident that year, Mr. Odom complained to IP Human Resources Generalist Rita Schafer, who is white, that Mr. Gay failed to follow Mr. Odom's direction. She then told Mr. Odom that she would make Plant Superintendent Ralph Buxton, who is white, aware of the problem. Mr. Buxton later counseled Mr. Gay about taking direction from Mr. Odom, and Mr. Gay later commented to Mr. Odom that he had put Mr. Buxton "on" Mr. Gay. (Odom Tr. 207:25–211:7.) Though Mr. Odom believes that Mr. Buxon should have done more, he has no facts from which to conclude that Mr. Buxton's behavior was motivated by race discrimination. (Odom Tr. 209:21–211:17.)

As another example of Mr. Gay's harassing actions, Mr. Odom points to a 2006 incident. In that incident, Mr. Gay and another hourly employee named Charles Rogers complained to Supervisor Moses and Safety Coordinator Whitehead that Mr. Odom should be fired because he was working in an unsafe manner and had caused Mr. Rogers to suffer a rope burn. (Odom Tr. 213:1–214:10.) Mr. Odom discussed the situation with Mack Harmon, the Inspector of the # 3 Paper Machine (who is white), and suggested Mr. Gay's actions in making the complaint might be motivated by race discrimination. Mr. Harmon, who is an hourly employee, told Mr. Odom that he did not believe that the actions of Mr. Gay and Mr. Rogers were race related. (Odom Tr. 185:12–14, 213:1–215:13, 229:20–25.) Mr. Odom's suggestion that the complaint might have been motivated by race discrimination was the only time prior to August 16, 2007 that Mr. Odom ever suggested to anyone at IP that another IP employee's behavior toward him was motivated by Mr. Odom's race. (Odom Tr. 183:15–185:17.)

D. November 2006 Incident

The tension between Mr. Odom and Mr. Gay apparently reached the boiling point

on November 6, 2006. Mr. Odom and some of his co-workers had fried some hot dogs while at work, and Mr. Gay was unhappy with the way that the area had been left. Mr. Gay used profanity to Mr. Odom and made statements that included reference to "damn pigs," but Mr. Gay did not touch Mr. Odom. (Odom Tr. 56:16–18, 92:24–95:16, 97:6–24, 106:15–17.) Mr. Odom responded by grabbing Mr. Gay's shirt collar as Mr. Gay was trying to walk away from a conversation with Mr. Odom. (Odom Tr. 106:18–21.) Mr. Odom's conduct in grabbing Mr. Gay's shirt collar violated IP's rules of conduct. (Odom Tr. 103:20–104:4.) IP began an investigation of the incident, and Mr. Odom presented his version of the facts. (Odom Tr. 99:21–103:14.) It was determined that Mr. Gay had been verbally abusive to Mr. Odom and that Mr. Odom had physically assaulted Mr. Gay. (Odom Tr. 104:5–21.)

IP issued Mr. Gay a three day suspension and issued Mr. Odom a thirty day suspension in lieu of termination of his employment. (Odom Tr. 98:18–22.) Mr. Odom was advised that a future violation of IP's workplace violence policy would result in more severe disciplinary action, up to and including termination of employment. (Odom Tr. 236:19–237:14.) While IP took the position that Mr. Odom's discipline was more severe than that provided to Mr. Gay because Mr. Odom had been engaged in physical touching and Mr. Gay had not engaged in such behavior, Mr. Odom believes that Mr. Gay should have received the same punishment as Mr. Odom. (Odom Tr. 106:6–14, 107:15–24; Russo Decl. Para. 12.) However, Mr. Odom did not file a grievance over his suspension or file a charge of discrimination. (Odom Tr. 98:23–24, 98:23–99:11, 170:4–6.)

IP points out that its discipline of Mr. Odom and Mr. Gay was consistent with its actions regarding an altercation between Paul Graham (white) and Phillip Mason (African American). In October 2005, Mr. Mason was verbally inappropriate while Mr. Graham resorted to physical contact. Mr. Mason, like Mr. Gay, received a three day suspension. Mr. Graham, like Mr. Odom, received a thirty day suspension. (Russo Decl. Para. 13.) IP further states, through its Human Resources Leader, Stephen Russo, that it "had no reason to believe that the friction between Mr. Odom and Mr. Gay was based on race and, in fact, Mr. Gay had friction with others in the workplace, both white and black." (Russo Decl. Para. 11.)

### E. July 2007 Incident

The event that precipitated this suit took place on the morning of July 10, 2007. By 2007, Mr. Odom was still working as a Backtender on the # 3 Paper Machine, which position was one of the two non-management "top jobs" on the # 3 Paper Machine. (Odom Tr. 20:16–21:4, 228:14–16; Russo Decl. Para. 5.) On July 10, 2007, Mr. Moses was Mr. Odom's supervisor. (Odom Tr. 40:17–21; 43:21–22.) Mr. Odom and his 11 p.m. to 7 a.m. shift crew were held over at the end of their work shift that day in order to make a felt change in the third dryer section of the # 3 Paper Machine. (Odom Tr. 113:11–114:5.) At the time, "Mr. Gay served in the position of Level 5A on the # 3 Paper Machine." Level 5A is a lower position classification than Backtender, with less responsibility for leadership, crew safety and lock out compliance than the Backtender position. (Russo Decl. Para. 16.)

Mr. Gay was temporarily assigned to fill in the Backtender role for the 7 a.m. to 3 p.m. shift on that day. This role required that he be involved in two different lock outs of Paper Machine # 3. One was the line shaft, and the other was the press section. (Russo Decl. Para. 17.) Before Mr. Gay locked out the line shaft, Mr.

Odom unilaterally modified the line shaft lock out checklist so that his crew could begin to work on the felt for the third boiler. (Odom Tr. 121:17–20; 148:1–15.) Mr. Odom put a lock on the line shaft and put a lock on the inch drive, and then asked Mr. Gay what else Mr. Odom needed to lock out to make the system safe. Mr. Gay responded that he was going to put a lock on the presses. Mr. Odom admits that "I should have stopped right then and got better information than [that] from Mr. Gay." (Odom Tr. 113:15–115:19; Odom Decl. Paras. 17–30.) Mr. Odom also admits that he should have asked Mr. Gay for the line shaft lock checklist, but he did not. (Odom Tr. 122:10–20.) Had Mr. Odom put a lock on the "capstan" at that time, he would have been at the zero energy state, but he did not do so. (Odom Tr. 125:6–20, 149:9–13.)

Shortly thereafter, in the course of checking the locks against the lockout sheet, Todd Foster, an hourly employee and member of the Paper Mill's Safety Team (who is white)[2], noticed that Mr. Odom had failed to lock out the machinery as required by the lockout sheet and the ZES policy. (Foster Tr. 25:15–26:10.) Because Mr. Foster did not believe it appropriate for an hourly worker to report an hourly co-worker's violation of rules, he did not report the violation to IP management. However, Mr. Foster did call up to the dryers to notify members of Mr. Odom's crew that the machine was not in ZES, a potentially dangerous situation, and asked that they tell Mr. Odom that he had committed a safety violation. (Odom Tr. 116:17–117:2, 147:5–7, 154:4–16; Odom

Decl. Paras. 27–28.) Mr. Foster states that he then also spoke with Mr. Odom and "told him he needed to get everybody off the lockbox because we needed to correct the problem." (Foster Tr. 27:8–12.) Mr. Odom does not recall such direct conversation.

After Mr. Odom was advised of the violation by his crew members, the other employees exited the drier. At that point, Mr. Foster was called away to deal with another issue. At the time that Mr. Foster returned to Mr. Odom's location, he intended to "correct[ ] . . . the line shaft, [get] a lock on the line shaft and then reestablish[ ] the lockbox for that dryer section [Odom] was working on," thereby remedying the situation. (Foster Tr. 29:14–18.) As of that time, Mr. Foster had not advised the Supervisor or IP management that there had been a safety violation. Because Mr. Odom did not see Mr. Foster when Mr. Odom exited the Paper Machine, Mr. Odom advised Supervisor Moses that he had committed a safety violation, and Mr. Moses then reported the incident to IP management. By the time that Mr. Foster returned to correct the line shaft lock out error, he discovered that Mr. Odom had already told Supervisor Moses of the safety violation. Mr. Foster described the matter as being, "out of his hands" once Mr. Odom had told the Supervisor of the safety violation. (Odom Tr. 117:3–12, 154:4–16; Odom Decl. Para. 29; Foster Tr. 26–30.)

IP placed Mr. Odom on suspension pending investigation of what had transpired. (Odom Tr. 157:25–158:15.) After

---

**2.** Mr. Odom, who had previously been a member of the Safety Team, explained in his Declaration that IP had established Safety Teams as part of it safety policy. He said that such Safety Teams are assigned to come in and audit the lock-out procedure on a scheduled maintenance day. "Although safety violations are serious, it has been IP's policy,

known as 'no name/no blame' (sic) requires that, if a member of the safety team finds a safety violation in the lock-out procedure, the team member, who is an hourly employee, brings the violation to the attention of the employee and the 'violation' is remedied. In this situation, no complaint is made to management." (Odom Decl. Para. 26.)

an investigation, IP concluded that Mr. Odom should have locked out the capstan. Mr. Odom admitted that he failed to comply with the ZES procedure, though he points out that it was unlikely anyone would have been injured as a result of such violation. (Russo Decl. Para. 18; Odom Decl. Para. 31.) Furthermore, while Mr. Odom concedes that "[t]he investigation was probably handled well," he believes . . . "it didn't bring out the point that should have been brought out that I wasn't given the opportunity to correct the problem before I went to Karl Moses like the other people that I have saved or helped being a safety team member." (Odom Tr. 158:4–9.)

After considering Mr. Odom's disciplinary history in the last several years, Mr. Russo (who is the Human Resources Leader at the Paper Mill with responsibility for labor relations) determined that IP should not place its employees at risk and that Mr. Odom should be removed from his position of Backtender. Mr. Russo maintains that "[t]he decision was unrelated to Mr. Odom's race." (Russo Decl. Para. 1, 18.) In light of Mr. Odom's long-term service and otherwise generally good work record, Mr. Russo sought a way to salvage Mr. Odom's employment. Therefore, on behalf of IP, Mr. Russo offered to resolve the situation by suspending Mr. Odom for 45 days, with Mr. Odom returning to work after entering into a "last chance agreement" that provided for immediate termination for future violations of Paper Mill rules or policies.[3] As part of that agreement, Mr. Odom would have also been demoted from the position of Backtender (hourly rate of $27.30) to a lower classification position known as Level 5A (hourly rate of $23.37), where he would have much less responsibility for lock out compliance and overall safety for the crew. (Russo Decl. Para. 19, Odom Tr. 159:9–19; Odom Depo. Ex. 15.)

The "last chance" proposal was made to Mr. Odom on July 23, 2007, and IP told both Mr. Odom and his union, the USW, that they could take time to consider IP's proposal. At the request of the USW, IP also agreed to give Mr. Odom a choice of two different jobs should he agree to the proposal. The USW then brought in an expert to discuss the terms of this agreement with Mr. Odom and to encourage him to accept the proposal. (Ocom Tr. 237:17–241:12.) Mr. Odom discussed the proposal with representatives of IP on a number of occasions after July 23, and on September 5, 2007 Mr. Odom declined IP's proposal, insisting that he wanted to return to the position of Backtender. (Russo Decl. Para. 21.) Mr. Odom states that he refused to accept the proposal because he "felt that it was further evidence of the company's disparate treatment in dealing with safety and other violations between whites and African–Americans." (Odom Decl. Para. 33.)

Mr. Russo stated that he determined that IP should not return Mr. Odom to his former position of Backtender and terminated his employment, effective September 10, 2007, because: 1) Mr. Odom had been involved in two willful ZES offenses and a workplace violence offense in little more than three years; 2) Mr. Odom held a leadership position and had responsibility in this role for the safety of his crew; 3) Management had concerns for the safety

---

3. During the period of September 2004 through September 2007, fourteen individuals were given last chance agreements in lieu of termination. Four of the fourteen were African American individuals, and ten of them were white individuals. All of these individuals accepted the terms of the last chance agreement in lieu of having their employment terminated. Mr. Odom was the only employee during this period that was offered and rejected a last chance agreement in lieu of termination of employment. (Russo Decl. Para. 25.)

of Mr. Odom and his crew members; 4) there was potential legal liability should Mr. Odom remain in the Backtender position and subsequently cause injury to himself or others; and 5) Mr. Odom refused to accept the last chance agreement. Mr. Odom was advised of the termination on September 5, 2007 and the termination letter was dated September 10, 2007. (Russo Decl. Para. 20, 21, attachment 3 - termination letter.) Mr. Russo states in his declaration that Mr. Gay was not disciplined for a violation of the ZES policy (Russo Decl. Para. 26.) Though implied, Mr. Russo did not specifically state in his declaration that Mr. Gay committed no violation in connection with the July 2007 incident.

After the termination, Mr. Odom filed a grievance, and the matter was scheduled for a Union arbitration. During the grievance procedure, the USW took the position that the penalty was too harsh, but it never took the position that Mr. Odom had not violated the ZES policy. The USW then withdrew the grievance before the arbitration hearing. (Russo Decl. Para. 24.) [4]

### F. Allegation of Discrimination

On November 7, 2007, Mr. Odom filed a Charge of Discrimination ("Charge") with the EEOC alleging race discrimination resulting in his termination. (Odom Tr. 252:21–253:4; 253:25–254;2; Odom Dep. Ex. 25.) On October 7, 2008, Mr. Odom filed his Complaint with this Court. In his Complaint, he alleged that "[d]uring the course of [his] employment, he has been subjected to discrimination on the basis of race by management as well as co-workers, in particular a white co-worker." (Compl. ¶ 7.) He goes on to allege that he "was terminated from his position as a

back tender for violation of International Paper's 'lockout' procedure." (Compl. ¶ 10.) Mr. Odom further states that the "white co-worker who had historically discriminated against [him] on the basis of his race prevented [him] from properly performing the company's 'lockout' procedure." (Compl. ¶ 11.) He also alleged that "no disciplinary action was taken against this individual" and that Mr. Odom was "treated differently from similarly situated employees of International Paper who violated the company's policies, including this 'lockout' procedure." (Compl. ¶ 13.) In his two-count Complaint, Mr. Odom alleges that he was terminated "because of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 1981." (Compl. ¶ 14.) IP generally denied such allegations in its Answer.

### II. Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Stated another way, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir.2007). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*

---

**4.** IP does not take the position that the CBA, or the filing of the grievance, in any way limits Mr. Odom's right to pursue the claims before the Court. *See 14 Penn Plaza LLC v.*

*Pyett*, —— U.S. ——, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009); *Safrit v. Cone Mills Corp.*, 248 F.3d 306 (4th Cir.2001).

*v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be considered by a court in its determination. *Id.* at 248, 106 S.Ct. 2505.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." In doing so, the judge must construe the facts in the light most favorable to the non-moving party, and may not make credibility determinations or weigh the evidence. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Holland*, 487 F.3d at 213. However, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### III. Discussion

#### A. Title VII and 42 U.S.C. § 1981 Framework

■ Title VII makes it "an unlawful employment practice for an employer ... to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privi-leges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). The Civil Rights Act of 1866 ("Act") provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Further defining subsection (a), the Act provides that "the term 'make and enforce contracts' includes ... termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Act also makes clear that it reaches both public and *private* discrimination, providing that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination." 42 U.S.C. § 1981(c). From the express language of the Act, and from its historical context as a post-Civil War rights act, it is evident that § 1981, like Title VII, prohibits race discrimination against African–Americans. *Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir.1995).

■ Mr. Odom alleges that he was discharged because of his race. Specifically, he says in his opposition brief that he "challenges his termination—not prior disciplinary actions or actions by fellow co-worker, R. Burt Gay."[5] (Opposition Brief, pg. 7.) He goes on to state: "However,

---

**5.** Mr. Odom is not alleging a Title VII hostile work environment claim. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir.2001) (discussing such claims and their requirements). However, in some circumstances, allegations of racially discriminatory remarks, whether or not they are sufficiently pervasive to prove a hostile work environment, may also constitute direct evidence of other discriminatory employment practices. *See Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861–62 (5th Cir.1993).

Plaintiff claims that IP has engaged in disparate treatment as it relates to discipline, including termination." (Opposition Brief, pg. 7.)

■ "A plaintiff generally may defeat summary judgment and establish a claim for race discrimination through one of two avenues of proof. First, a plaintiff may establish a claim of race discrimination by demonstrating through direct or circumstantial evidence that his race was a motivating factor in the employer's adverse employment action." *Holland*, 487 F.3d at 214. "The second method of averting summary judgment is to proceed under a 'pretext' framework under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* (citations omitted). The prima facie case must be made out by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Mr. Odom makes his discrimination claim in the pretext framework. The United States Court of Appeals for the Fourth Circuit has held that in order to establish a prima facie case of discriminatory discharge based upon race, a plaintiff must show: (1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) that the position remained open or was filled by a similarly qualified applicant outside the protected class. *Holland*, 487 F.3d at 214 (4th Cir. 2007), *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.2003). While Mr. Odom's claim arose in the context of a proposed disciplinary demotion that was rejected by the employee and therefore resulted in discharge, the Fourth Circuit has applied this same test in such a context. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir.1999).[6] Therefore, the Court will apply these factors.[7]

**6.** The parties disagree as to the elements of the prima facie test that should be applied in this case. Relying upon *Johnson v. Mechs. & Farmers Bank*, 309 Fed.Appx. 675, 683 (4th Cir.2009) (unpublished table opinion) (*citing E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992), IP asserts that the Court should replace the traditional fourth factor by asking whether the plaintiff "was treated less favorably than persons who are not members of the protected class." However, *Johnson* and *Clay* involved age discrimination claims. Relying upon *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510 (4th Cir.2006), Plaintiff asserts that the traditional second and third factors should be replaced with the following factors: 2) that plaintiff show he was qualified for the job and met his employer's legitimate expectations (which is essentially factor three under the traditional test), and 3) that he was discharged despite his qualifications and performance. However, *Warch* also involved age discrimination. While *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973) expressly observed that its formula would have to be adapted to particular applications, this Court declines to adopt the alternative factors proposed by the parties. Nonetheless, the Court notes that the element upon which the Court's analysis focuses below is whether Mr. Odom was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action, and this factor is essentially common to both of the parties' proposed factors.

**7.** Whatever formulation of the prima facie case is used, the central inquiry in evaluating whether plaintiffs have met their initial burden is whether the circumstantial evidence presented is sufficient to create a presumptive inference that an illegal criterion was a basis for an employment-related decision. 1 Barbara T. Lindeman & Paul Grossman, Employment Discrimination Law Ch 2.II.A.2, at 25 (C. Geoffrey Weirich et al. eds., 4th ed.2007).

 If a plaintiff can make a sufficient showing of these four elements,[8] the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for plaintiff's discharge. *Holland,* 487 F.3d at 214. "This burden, however, is a burden of production, not persuasion." *Id.* If the employer *articulates* such a reason, the presumptive inference of discrimination drops from the case. *Id.* The plaintiff then must show that the articulated reason is a pretext for discrimination. *Id.* "In other words, the burden shifts back to [plaintiff] to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (citations omitted). Accordingly, this burden to demonstrate pretext "now merges with the ultimate burden of persuading the court that [the employee] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. Stated another way:

In *Reeves,* the Supreme Court clarified how a claimant can avoid summary judgment under the *McDonnell Douglas* framework. Once the question comes down to pretext, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (internal

quotation marks omitted). A plaintiff could accomplish this goal "by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

*Holland,* 487 F.3d at 214. This same burden shifting analysis applies to claims, such as Mr. Odom's claim in Count Two, that are made pursuant to 42 U.S.C. § 1981. *Lightner v. City of Wilmington,* 545 F.3d 260, 263 (4th Cir.2008).

### B. Prima Facie Case

 There is no dispute here that Mr. Odom satisfies the first, second, and fourth elements of the prima facie case test. Both parties either specifically agree, or do not dispute, that Mr. Odom is a member of a protected class, that he suffered an adverse employment action, and that the position remained open or was filled by similarly qualified applicants outside the protected class. The dispute involves the third element of the prima facie case test—whether he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action.[9]

Mr. Odom did not deny that he committed a safety violation. He frames the argument as follows: "Although the evidence is undisputed that Odom received disciplinary write-ups and suspensions in 2004, 2006 and 2007, whether he was performing

8. Proof of the four factors creates a "presumptive inference" of discrimination "only because [the court] presume[s] these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Miles v. Dell, Inc.,* 429 F.3d 480, 488 n. 5 (4th Cir.2005).

9. Where, as here, a plaintiff seeks to show by a preponderance of the evidence that he met the employer's legitimate job expectations in an effort to prove his prima facie case, the employer may counter with evidence defining the expectations as well as evidence that the

employee was not meeting those expectations. *Warch,* 435 F.3d at 516. However, this same evidence may be presented by the employer in an effort to rebut the presumptive inference created by a plaintiff's prima facie case. For the reasons stated in *Warch,* consideration of such evidence at both stages of the analysis does not, as was argued in that case, impermissibly collapse the second stage of the *McDonnell Douglas* framework into the prima facie case. *Id.* at 514–17. Having different purposes at each stage, such evidence may be considered at both stages.

his job to his employer's expectations is a factual dispute." (Opposition Brief, pg. 10.) This issue was addressed in some detail by the Fourth Circuit, where the Court said the following:

> Although on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered "expectation" is not, in fact, legitimate at all. Thus, where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, "legitimate."

*Warch*, 435 F.3d at 517. Therefore, while "(j)ob performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision,"... "[w]hen the legitimate expectations of an employer are at issue on summary judgment, both the employer and employee may present evidence of the expectations themselves and their legitimacy." *Johnson*, 309 Fed. Appx. at 683 n. 8 (*citing Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996) and *Warch*, 435 F.3d at 515–17).

 In order for a plaintiff to show that he was meeting his employer's legitimate expectations, "the prima facie case requires the employee demonstrate 'that he was 'qualified' in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative.'" *Warch*, 435 F.3d at 515 (noting that "Warch's argument that he only needs to show that he is 'qualified' for the job,

rather than meeting his employer's legitimate job expectations, is foreclosed by circuit precedent." *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 298 (4th Cir.2004) (en banc)). "In evaluating performance, '[i]t is the perception of the decision maker which is relevant.'" *Johnson*, 309 Fed.Appx. at 683 n. 8 (*citing Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980)). Mr. Odom argues that there is a genuine issue of material fact as to whether IP's expectations were in fact legitimate. As support for this assertion, he relies on various facts.

### 1. prior performance evaluations

 Mr. Odom first suggests that IP's evaluations of his performance over the two years prior to his termination demonstrate that he was meeting the company's expectations. "IP does not dispute the fact that in his day-to-day performance, [Mr. Odom] performed at a more than satisfactory level." IP responds that "[t]his fact is not relevant, however, as there is no dispute that he violated IP's policies and that the adverse action at issue was taken because of these infractions." (Reply Brief, pg. 2.)

Mr. Odom had three "serious performance issues" in the three years leading up to his termination, all of which were reviewed in more detail above and were specifically cited in his termination letter. (Russo Decl. Attachment 3.) In 2004, Mr. Odom committed a workplace safety violation involving the ZES policy. In 2006, Mr. Odom violated IP's workplace violence policy. In 2007, Mr. Odom committed another workplace safety violation involving the ZES policy. While Mr. Odom seeks to offer up mitigating factors as to each of these incidents, there is no question from the evidence before the Court that IP had a *facially* legitimate expectation that Mr. Odom would not violate these policies and that he did, in fact, commit the violations.[10]

---

**10.** Mr. Odom admitted at the time of the 2007 incident that he had in fact violated the ZES

Mr. Odom expresses concern that IP might mask his satisfactory performance by using facially legitimate allegations of violation(s) to cover an actual discriminatory purpose when other employees are not in fact held to the same standard. The Fourth Circuit addressed this concern extensively in *Warch*, noting that there are various ways that courts could address such an "anomaly," including only considering the employee's performance *before* the events sparking termination. *Warch*, 435 F.3d at 516 (in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir.2000) the Sixth Circuit "attempted to remedy this anomaly by looking 'at whether an employee met her employer's legitimate expectations *prior* to the event(s) that sparked the termination.'"). Rejecting this option, the Fourth Circuit concluded that such an approach is "unworkable, especially where there is no one 'event' that 'sparked the termination,' but instead a long string of performance problems leading up to firing." *Id.* at 516. However, the Fourth Circuit explained that concerns about such an "anomaly" may be addressed by employees through the presentation of evidence that a proffered expectation is not legitimate. *Warch*, 435 F.3d at 516–17. As the *Warch* court noted, "[t]hus, where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate.'" *Id.* at 517.

Therefore, while controlling Fourth Circuit precedent precludes Mr. Odom from simply pointing to other satisfactory performance evaluations where there is a string of documented performance problems leading up to termination, he may seek to make out a prima facie case by showing that IP's expectation (that he would not repeatedly commit such violations) was not legitimate. As the Fourth Circuit noted in *King*, one way for an employee "to establish that his work met [the employer's] legitimate job performance expectations he had only to offer qualified expert opinion testimony as to (1) [employer's] legitimate job performance expectations and (2) analysis and evaluation of King's performance in light of those expectations." *King*, 328 F.3d at 149–50. This might even be done in some cases by use of co-workers as experts. *Id.* at 150. However, when facing a string of performance problems leading up to termination, Mr. Odom's efforts to rely on prior satisfactory performance evaluations cannot create a genuine issue of material fact as to whether he was performing to the employer's legitimate expectations. *See Warch*, 435 F.3d at 518 ("Faced with such abundant evidence, Warch cannot create a genuine dispute concerning his prima facie case by cherry-picking the record to find one isolated instance where he arguably performed better than the average employee.").[11]

### 2. management evaluations

Mr. Odom next argues that the observations of other members of IP management are consistent with the positive evaluations referenced above. Again, there is no dispute that on a day-to-day basis Mr. Odom

policy, though he apparently felt that Mr. Gay failed to be as proactive as Mr. Odom would have hoped-potentially even constituting a safety violation by Mr. Gay. Nevertheless, Mr. Odom's admission that he violated the policy refutes his suggestion that IP's expectations were not legitimate in this regard.

**11.** While Mr. Odom has pointed to several "satisfactory" performance evaluations and favorable comments from other IP employees, they do not wipe away his workplace safety/violence violations. Moreover, Mr. Odom has not submitted any expert affidavits or depositions negating such violations.

performed satisfactorily. However, IP asserted a facially legitimate basis for his proposed demotion, and ultimate discharge, based upon his safety and violence policy violations As explained above, despite Mr. Odom's reliance on management comments about his performance, he cannot simply ignore the other violations and claim that he has refuted IP's assertion of such violations as being legitimate reasons for the termination by pointing to other satisfactory evaluations/comments. IP has countered Mr. Odom's assertion with evidence defining its expectations as well as evidence that Mr. Odom's performance was not meeting those expectations. *Warch*, 435 F.3d at 516; *Miller v. Locke*, Civil No. 1:09–cv–1149, 2009 WL 1675486, at *4, 2009 U.S. Dist. LEXIS 49707, at *10 (E.D.Va.2009) (positive notes about plaintiff's job performance taken out of context "do not establish that [his] overall performance was satisfactory nor do they cast doubt on [employer's] position, as stated in its termination notice" sufficient to make a prima facie case). Therefore, the management evaluations and comments to which Mr. Odom points do not create a genuine issue of material fact.

### 3. line shaft lockout checklist

Mr. Odom also argues that since IP knew he did not receive the "appropriate checklist for locking out the line shaft" during the 2007 precipitating incident, such knowledge undermines IP's contention that it considered his violations serious enough to terminate his job. This is, in essence, an attack on the investigation and culpability conclusions reached by IP after the 2007 incident. However, even if one assumes that IP management was mistaken about Mr. Odom's culpability, such mistakes do not show that IP's stated reasons for Mr. Odom's discipline were false or discriminatory as mere mistakes of fact are not evidence of discrimination. *Price v. Thompson*, 380 F.3d 209, 214–15 n. 1

(4th Cir.2004) ("mere mistakes of fact are not evidence of unlawful discrimination").

This issue was the subject of discussion at Mr. Russo's deposition. Such discussion did not take place in a vacuum, however. It must be remembered that Mr. Odom was the Backtender and that he was responsible for the safety of his crew—a crew that was working on a machine that was not in ZES and thereby created a risk (however minimal) of injury or death. (Russo Tr. 149:1–4.) Mr. Odom's counsel asked Mr. Russo whether he was aware that Mr. Odom believed Mr. Gay was going to lock out the line shaft, and Mr. Russo said that he believed that had been mentioned by Mr. Odom at one of the grievance meetings. (Russo Tr. 150:9–25.) While the rest of the Russo deposition response was not provided to the Court, again, it must be remembered 1) that Mr. Odom had responsibility for the safety of his crew; 2) that at the time of the 2007 incident, Mr. Odom admitted that he had violated the ZES policy, (Russo Decl. Para. 18.), and 3) that during his deposition, Mr. Odom admitted that after talking with Mr. Gay about the lockout checklist, "I should have stopped right then and got better information than [that] from Mr. Gay." (Odom Depo. Tr. pg. 115.) Therefore, Mr. Odom's perception that IP mistakenly concluded he failed to meet their legitimate expectations is 1) belied by the facts before the Court, and 2) not evidence of unlawful discrimination since there is no evidence that it is more than, at most, a mistake of fact.

### 4. No Name Harm/No Blame Policy

Mr. Odom further argues that Todd Foster's failure to come to him "confidentially, as he is supposed to do," to report the 2007 safety violation, somehow undermines IP's contention that it considered Mr. Odom's violation serious enough, in conjunction with his other violations, to

terminate his job. (Opposition, pg. 12.) When clarifying this point in his deposition, Mr. Odom said "The investigation was probably handled well, but it didn't bring out that I wasn't given the opportunity to correct the problem before I went to Karl Moses like the other people that I have saved or helped being a safety team member." (Odom Depo. pg. 158.)

This is an attack on the investigation and its conclusions. However, once again, such alleged mistakes of fact from an investigation do not show that IP's stated reasons for Mr. Odom's discipline were false or discriminatory. *Id.* Moreover, to the extent that Mr. Odom seeks to ascribe a discriminatory motive to Mr. Foster (something for which absolutely no supporting facts have been provided), any such assertion suggests nothing about the motives of the decision makers who decided to reprimand Mr. Odom. *King*, 328 F.3d at 149 ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."). Finally, Mr. Odom suggests that Mr. Foster's motivation for not reporting the safety violation directly to him, rather than his co-workers, was Mr. Foster's desire to have Mr. Odom's job. While there is absolutely no evidence of such a motivation, even if there was it would not constitute a *racial* animus.[12]

### 5. Mr. Gay's alleged violations

Mr. Odom makes several arguments about the manner in which Mr. Gay acted or was treated, and suggests that they undermine IP's assertion that it considered his 2007 violation, in conjunction with his prior violations, serious enough to terminate his job.

#### a. no disciplinary action against Mr. Gay

Mr. Odom asserts that "Gay violated the ZES procedure by failing to follow the checklist given to him and informing Odom that, since he had done the line shaft lockout, he would proceed to lockout the presses." (Opposition, pg. 12.) Based upon this, Mr. Odom then states that "[n]o disciplinary action was taken against Gay." Though not clearly articulated, the implication is that IP did not have a legitimate expectation that Mr. Odom would comply with the ZES policy in these circumstances since IP did not take disciplinary action against Mr. Gay when he allegedly violated the ZES policy.[13]

From a factual standpoint, the Court has already pointed out above that Mr. Odom admitted he committed a safety violation as a result of the 2007 incident, and he has admitted that he should have obtained more information from Mr. Gay during the course of the lockout procedure. Additionally, the Backtender position carries greater responsibility for ensuring crew safety and lock out compliance than does the Level 5A position. Furthermore, IP conducted a fairly detailed investigation that Mr. Odom admits was handled well. While Mr. Odom disputes the results of the investigation, he has provided no evidence that the investigation was conducted

---

**12.** As the facts above explain, Mr. Foster testified in his deposition that he was called away immediately after he discovered the safety violation and notified the crew and Mr. Odom. Mr. Foster explained that by the time he came back to clear the violation with Mr. Odom, he discovered that Mr. Odom had advised Supervisor Moses of the violation and Mr. Foster believed that it was then out of his (Mr. Foster's) hands.

**13.** Mr. Odom has characterized his various arguments as efforts to refute IP's assertion that he failed to meet their legitimate expectations. No matter how it is characterized, a plaintiff's effort to show differential treatment may take place at the prima facie stage or at the later pretext stage. Cases addressing such allegations of unequal application of a work rule are frequently characterized as "work rule" cases. 1 Lex K. Larson, Employment Discrimination § 8.08[4] (2d ed.2009).

in a discriminatory manner. As for the inference in Mr. Odom's argument that Mr. Gay acted out of some bias during the 2007 incident, it must be observed that the mere fact that a subject of an investigation is allegedly biased has no bearing on the motives of the investigators. *See Hill,* 354 F.3d at 295; *Wheeler v. Aventis Pharmals.,* 360 F.3d 853, 859 (8th Cir.2004) (coworkers' alleged statements of bias "were not made by decision makers and—because [plaintiff] is not alleging a racially hostile work environment—are thus irrelevant"). Moreover, nothing in the record suggests the investigators of the 2007 incident were aware of Mr. Gay's alleged racial motive. Therefore, these factual assertions are without legal relevance.

 From a legal standpoint, there are also significant problems with Mr. Odom's effort to compare himself to Mr. Gay. While one method of proving disparate treatment is by showing dissimilar treatment, the persons being compared must be "similar in all relevant respects." *Heyward v. Monroe,* No. 97–2430, 1998 WL 841494, at *2, 1998 U.S.App. LEXIS 30855, at *6 (4th Cir.1998) (unpublished table disposition); *JDS Uniphase v. Jennings,* 473 F.Supp.2d 705, 712 (E.D.Va.2007). The compared employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Miller,* 2009 WL 1675486, at *4, 2009 U.S. Dist. LEXIS 49707, at *13 (citations omitted). Mr. Odom and Mr. Gay were not similarly situated as to the July 2007 incident for the following reasons:

1) At the time of the July 2007 incident, Mr. Gay's permanent position was serving in the Level 5A position on the #3 Paper Machine, a lower position classification than Backtender and a position with less responsibility for leadership. Mr. Odom became a Backtender on the #3 Paper Machine in 2001. In this position, he was responsible for the overall production of the paper on the "dry end" of the paper machine and ensuring that work activities of other employees on the paper machine were performed "correctly and safely." (Odom Tr. 19:17–20:7; 22:8–10.) Therefore, aside from the facts supporting the discipline of Mr. Odom and the absence of such discipline for Mr. Gay, the actions of the two employees cannot be compared since they held different positions with different expectations.

2) Even if we assume Mr. Gay committed a violation, the investigation of the July 2007 incident revealed that Mr. Odom and Mr. Gay were not equally culpable in the incident. Mr. Gay did not fail to lock out a live machine in violation of the safety policy. Mr. Odom merely claims that an alleged representation by Mr. Gay led Mr. Odom to make an assumption that in turn led to Mr. Odom's failure to lock out the Paper Machine for which Mr. Odom was responsible. Furthermore, Mr. Odom admits that the investigation was "probably handled well."

3) Mr. Odom's discipline was the result of his 2007 safety violation *in conjunction* with his existing disciplinary record. Unlike Mr. Odom, Mr. Gay had no record of assaulting a coworker, *see Forrest v. Transit Mgmt. of Charlotte, Inc.,* 245 Fed.Appx. 255, 257–58 (4th Cir.2007) (unpublished table disposition), nor did Mr. Gay have another similarly serious safety violation on his employment record. *Plummer v. Fruit,* No. 98–1323, 1999 WL 160670, at *1–2, 1999 U.S.App. LEXIS 5039, at *3–5 (4th Cir.1999).

Even if it had been determined that Mr. Gay was in some way culpable in the July 2007 incident, these differences in the employment records of Mr. Odom and Mr.

Gay alone warrant potential variances in their discipline and undermine comparison. *Mahomes v. Potter*, 590 F.Supp.2d 775, 795 (D.S.C.2008) (being further along disciplinary process undermines use as comparator).[14]

b. Odom misled by Gay

Mr. Odom suggests that IP's failure to consider that Mr. Gay may have misled Mr. Odom undermines IP's claim that the 2007 incident constituted a violation of their legitimate expectations. As the Court has already stated, there is virtually no evidence that Mr. Gay misled Mr. Odom, other than Mr. Odom's belief that Mr. Gay should have provided him with more information during the lock out procedure. In fact, Mr. Odom admits that he should have taken further action himself.

However, even if one assumes that Mr. Gay misled Mr. Odom, there is no evidence that such action was motivated by race. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir.2000) ("Law does not blindly

ascribe to race all personal conflicts between individuals of different races").[15] Furthermore, even if Mr. Gay had misled Mr. Odom because of Mr. Odom's race, because he was not a "principally responsible" decision maker, his motive is not evidence of whether IP had a legitimate expectation that Mr. Odom would not engage in a safety violation. *Hill*, 354 F.3d at 295.[16] Finally, even if IP failed to appreciate the degree to which Mr. Gay's actions resulted in Mr. Odom's safety violation (an assertion which has no factual basis)[17], any mistake of fact as a result of the IP investigation is not alone evidence of discrimination. *Price*, 380 F.3d at 214–15 n. 1. (mistakes of fact are not evidence of unlawful discrimination).

6. Odom's Co-workers

Mr. Odom claims that while other members of his crew, who were white, signed off on the lockout checklist involved in the July 2007 incident and thus violated the safety policy, no action was taken against

---

**14.** The July 2007 incident took place in the year following Mr. Odom's significant violation involving Mr. Gay. Mr. Odom suggests that he and Mr. Gay were treated differently as a result of the 2006 incident. Notwithstanding Mr. Odom's efforts to question the investigation of, and punishment for, the 2006 assault incident, the fact remains that by Mr. *Odom's own admission he physically assault-*ed Mr. Gay while Mr. Gay did not physically assault anyone. The difference in behavior reflects an adequate explanation for the disparate discipline.

**15.** The only comment Mr. Gay is alleged to have made to Mr. Odom about race involved Mr. Gay's purchase of a chair from Mr. Odom. When Mr. Gay picked the chair up from Mr. Odom's home, Mr. Gay is alleged to have made the statement in front of Mr. Odom that "[Mr. Odom] had a nice house for a black guy." (Odom Tr. 220:1–221:5). While this statement may be reflective of an insensitivity, it is completely unrelated to the 2007 incident in time and space. Furthermore, it does not reflect any racial animus motivating the 2007 incident. *Ingram v. Balt.*

*Gas & Elec. Co.*, Civil Action No. CCB–02–2869, 2004 WL 350583, at *11, 2004 U.S. Dist. LEXIS 2853, at *40 (D.Md.2004) ("None of the incidents cited by Ingram were overtly racial in nature, and Ingram has presented no specific facts beyond his own conclusory statements to establish that the incidents were based on race, or that he was treated less favorably than white employees").

**16.** The allegedly biased co-worker in *Hill* played some limited advisory role in the termination decision, whereas here Mr. Gay had no such role in IP's decision-making process. *Hill*, 354 F.3d at 296.

**17.** Mr. Russo explained that he viewed Mr. Odom's violation as a "willful" violation, which he distinguished from a "mistake." Although the rest of Mr. Russo's explanation was not provided to the Court, he presumably made this distinction based on the fact that Mr. Odom unilaterally modified the lock out checklist and then assumed that Mr. Gay had completed the remaining portion—which he had not. (Russo Tr. 149:24–150:8.)

them. (Opposition, pg. 12.) Mr. Buxton admitted in his deposition that he probably made a mistake in not disciplining the crew members working with Mr. Odom. However, he explained that he saw Mr. Odom's violation as "the more major violation" he was focused upon, and that it was more major because "in the grand scheme of things, [the crew members] put themselves at risk. Mr. Odom put others at risk" since he was the "responsible employee" who was "securing it for others." (Buxton Tr. 165:16–166:25.) Therefore, even if IP's investigators were mistaken about the parties' culpability, such mistakes do not show that IP's stated reasons for *Mr. Odom's discipline* were false or discriminatory. *Price*, 380 F.3d at 214–15 n. 1. Furthermore, Mr. Odom's assertion of the other crew members' violations seems to refute his statement that "every member of [Mr. Odom's] crew, as they were required by policy, placed their locks on the equipment." (Opposition, pg. 4.) Moreover, Mr. Odom's efforts to compare his treatment as a Backtender, having significant responsibility for safety during lockout procedures, with that of his crew member co-workers, is undermined by the fact that, having different jobs and levels of responsibility, they are not similarly situated and therefore cannot be used as comparators. *See Forrest*, 245 Fed.Appx. at 257 (excluding as comparators co-workers involved in the same misconduct as plaintiff because "these individuals were not subject to the higher standard of performance that was applicable to [plaintiff] as a supervisor").

### 7. Other Reasons

Mr. Odom suggests other facts undermine IP's assertion that his safety violations were not consistent with their legitimate expectations for his performance. For example, Mr. Odom claims that his violation was "inadvertent" and that IP had no legitimate expectation that he not engage in inadvertent violations. (Opposition, pg. 13.) This assertion, on its face, makes little sense. Mr. Odom was the Backtender on the #3 Paper Machine in July 2007, with responsibility for ensuring that the work activities of other employees on the machine were performed "correctly and safely." (Odom Tr. 19:17–20:7; 22:8–10.) As part of this obligation, he was also responsible for locking out the machine and ensuring that it was in ZES. (Russo Decl. Para. 10.) Furthermore, he clearly understood that one of the fastest ways to lose one's job at IP is committing a safety violation or doing something unsafe. (Odom Tr. 229:16–19.) Since it is obvious that workers can be injured whether as the result of an *inadvertent* unsafe act or a willful unsafe act, from a safety standpoint, it makes little difference whether an unsafe action is inadvertent or willful if it results in injury to IP employees. Therefore, this argument does not undermine IP's assertion that it had a legitimate expectation that Mr. Odom would not engage in such safety violations. If anything, it perhaps explains in part why Mr. Odom was offered a demotion in lieu of termination.

In an apparent effort to minimize IP's stated expectation that he would not violate the ZES policy, Mr. Odom also argues that "[b]eing an experienced backtender," he took it upon himself to decide that "there was no reason to lockout the line shaft box." (Opposition, pg. 6.) The suggestion is that he had the authority to do so and that authority thereby negates any alleged safety violation. However, Mr. Odom admitted that he violated a legitimate ZES policy. Therefore, his effort to suggest that such violation was of no significance must be viewed with skepticism. *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir.1997) ("It is well established that a genuine issue of material fact is not created where the only issue of fact is to determine which of the

two conflicting versions of the plaintiff's testimony is correct."). Furthermore, even if the Court were to credit Mr. Odom's assertion that his violation was inadvertent or technical, it must be remembered that it is the employer's perception that matters in determining whether an employee's performance was satisfactory to meet his employer's expectation, and whether such expectations were legitimate. *Smith,* 618 F.2d at 1067. It is clear that Mr. Russo and Mr. Buxton did not believe Mr. Odom's performance was satisfactory.

### 8. summary

Mr. Odom has failed to show a genuine issue of material fact by presenting evidence that his performance met IP's legitimate expectations and that IP's proffered job expectation is not, in fact, legitimate. *Warch,* 435 F.3d at 517. Having failed to do so, he cannot counter IP's assertion that the job expectation prong has not been met. Accordingly, Mr. Odom has not made out a prima facie case.

### C. IP's Legitimate Non–Discriminatory Reason And Plaintiff's Pretext Claim

■ As discussed above, under the *McDonnell Douglas* framework, if an employee establishes a prima facie case (which Mr. Odom has failed to do), the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action. *Hill,* 354 F.3d at 285. When the employer meets its burden by proffering such a legitimate non-discriminatory reason, the *McDonnell Douglas* framework "disappear[s] and the sole remaining issue [is] discrimination *vel non.*" *Id.* The employee then has the ultimate burden to prove that the employer's proffered reasons were but a pretext for discrimination. *Hill,* 354 F.3d at 285. A plaintiff may meet this burden by presenting evidence that his employer's proffered reasons are not worthy of belief, thereby

enabling the jury to infer that discrimination was the real reason for the adverse action, or by presenting evidence that discrimination was, in fact, the employer's real reason. *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, in seeking to meet this burden, a plaintiff may not recast an employer's legitimate, non-discriminatory reason or substitute his business judgment for that of the employer, but must instead meet each reason head on and rebut such reason. *Miller,* 2009 WL 1675486 at *5–6, 2009 U.S. Dist. LEXIS at 49707, at *15–16 (*citing Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir.2000)). Therefore, it is irrelevant whether the employer was correct in its assessment of an employee's performance, so long as its assessment was, in fact, the true reason for its termination. *Id.* at *5–6, 2009 U.S. Dist. LEXIS at 49707 at *16.

■ Assuming, for the sake of argument, that Mr. Odom made a prima facie showing, the Court will briefly address the application of the evidence to this burden-shifting framework. The employer's burden to proffer a legitimate non-discriminatory reason at this stage is a burden of production, not a burden of persuasion. *Holland,* 487 F.3d at 214. Here, IP meets its burden by producing depositions and declarations that, after having prior rule violations, Mr. Odom again violated the ZES safety policy. As a result, IP meets its burden of production and any prima facie case disappears from the case. The burden then shifts back to Mr. Odom to prove by a preponderance of the evidence that IP's stated reasons were not its true reasons, but were a pretext for discrimination. To do this, Mr. Odom would have to "prove' *both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary*

*Washington Coll.*, 57 F.3d 369, 378 (4th Cir.1995) (citations omitted).

■ For the same reasons that Mr. Odom has failed to make the showing necessary for the third factor of a prima facie case (that he was performing at a level that met his employer's legitimate expectations at the time of his termination), he cannot prove by a preponderance of the evidence that IP's stated reasons were not its true reasons and that discrimination was the real reason for his termination. Without addressing each of these arguments in detail again, it is helpful to review a few of the more salient points. For example, Mr. Odom's efforts to show that Mr. Gay's actions somehow reflect a discriminatory motive by IP Management is unavailing. As discussed in detail above, Mr. Gay's motives, if any, were irrelevant in this unlawful discrimination analysis because he was not a decision-maker in the demotion and termination process. *Hill,* 354 F.3d at 295.[18] Furthermore, Mr. Odom's various attacks on the investigation of the July 2007 incident are unavailing, since "mistakes of fact are not evidence of unlawful discrimination." *Price,* 380 F.3d at 214–15 n. 1. Moreover, many of Mr. Odom's efforts to show that there is a genuine issue of material fact precluding summary judgment are directed at comparing Mr. Odom's treatment with that of Mr. Gay and other employees. The problem with this effort is that Mr. Odom does not compare himself to employees similarly situated to himself in all relevant respects. *Nichols v. Caroline County Bd. Of Educ.*, Civil No. JFM–02–3523, 2004 WL 350337, at *7, 2004 U.S. Dist. LEXIS 2851, at *24 (D.Md.2004), *aff'd* 114 Fed.Appx.

576 (4th Cir.2004) ("to be valid comparators, other employees must be similarly situated in all relevant respects").

Nothing in the record shows that IP's decision to demote Mr. Odom to a lower, less safety-sensitive, position was pretextual, or that its ultimate decision to terminate him upon his refusal of the demotion was pretextual. Given Mr. Odom's two safety violations and the prior physical assault on Mr. Gay, IP's decision does not appear to be irrational. Mr. Odom's efforts to question that decision have been examined exhaustively above, and while such evidence may be used "at different stages of the *McDonnell Douglas* framework," because of the thorough review above it need not be extensively rehashed here. *Warch,* 435 F.3d at 516. Therefore, even if Mr. Odom had established a prima facie case, IP has proffered a legitimate non-discriminatory reason for his termination, and Mr. Odom has not shown that such reason was pretextual.

## IV. Conclusion

For the reasons stated above, Mr. Odom has failed to raise a genuine issue of material fact, and IP's Motion for summary judgment is therefore **GRANTED**. The Clerk is **DIRECTED** to enter judgment for defendant IP in accordance with this Opinion and Order, and to send a copy of this Opinion and Order to counsel for plaintiff and defendant.

**IT IS SO ORDERED.**

---

18. Mr. Odom has not alleged a hostile work environment claim. If he had, Mr. Gay's actions might be of more importance, though it is doubtful that Mr. Odom could have successfully pressed such a claim based upon the allegations currently before the Court.

*Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183–84 (4th Cir.2001); *Patterson v. County of Fairfax*, No. 99–1738, 2000 U.S.App. LEXIS 11009, at *10–15 (4th Cir.2000) (unpublished table disposition).